UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 4:05CR701CDP(MLM) |
| ) | |
| EUGENE GILL, ) | |
| ) | |
| Defendant. ) | |

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This matter is before the court on defendant's Motion to Suppress Evidence and Statements. [Doc. 14] The government responded. [Doc. 16] On 3/2/06 an Evidentiary Hearing was held at which the government presented the testimony of Detective Phillip Menendez, Deputy Marshal Kyle Shirley and Deputy Marshal Keith McGillivrey. The defendant did not present evidence. Based on the testimony and evidence adduced and having had the opportunity to observe the demeanor and evaluate the credibility of the witnesses, the undersigned makes the following findings of fact and conclusion of law.

**FINDINGS OF FACT**

Detective Menendez is employed by the St. Louis Metropolitan Police Department and is assigned to the Narcotics Division. On May 12, 2004, Det. Menendez presented an Application for a Search Warrant for the premises at 2000 Ridgedale Drive and an Affidavit in Support to Judge William J. Wegge of the Jefferson County Circuit Court. Gov.Ex.A. The Application describes the property with particularity and describes the contraband believed to have been used to commit the felony of Violation of the Missouri Controlled Substance Law as: "Marijuana, drug paraphernalia, U.S. currency, packaging materials, firearms and fruits of the crime."

The Affidavit in Support states that Det. Menendez was contact by a Confidential Source ("CS") approximately three days prior to the Application. The CS informed him that a white male

subject identified as "Will" who resides in the State of Texas had secured a room at the Harrah's Casino in Maryland Heights. The CS stated that Will was in possession of approximately 200 pounds of marijuana and was negotiating the sale as well as actually selling the marijuana from his hotel room. The CS further stated that Will drove a green Nissan SUV-type vehicle bearing Texas tags which was parked on the fourth floor of the Harrah's Casino parking garage.

Det. Menendez and Det. Jason Scheel responded to the parking garage and located Will's vehicle. They set up surveillance and contacted Det. Sgt. Anthony D. Boone and informed him of the circumstances surrounding the investigation. Det. Sgt. Boone then contact Det. Sgt. Joseph Delia of the Maryland Heights Police Department and relayed the information to him. A short time later, a white male exited the parking garage elevators and walked towards the car identified as that belonging to Will. Det. Menendez and Det. Scheel contacted Will and informed him of the information. Approximately 44 pounds of marijuana were seized from Will's vehicle. Will agreed to cooperate with the investigation.

Later that evening, Will contacted his source of supply, "Frank", and advised that he had Frank's $26,000 that he had earned by selling some of the marijuana. Frank agreed to come to Will's hotel room to collect the money. The Affidavit notes that the $26,000 was only going to be used as a prop (flash money) provided by the Narcotics Division of the St. Louis Metropolitan Police Department.

Upon Frank's arrival, he entered the hotel room and spoke to Will about marijuana that was seized by the St. Louis Metropolitan Police Department and other future narcotics transactions. During these conversations Frank was counting the $26,000. After meeting in the room, Frank left the room and was arrested by the officers for distribution of marijuana. All the conversations with Frank by telephone were recorded on audio tape and the meeting in the hotel room was recorded on both audio and video tape.

While interviewing Will about the whereabouts of the rest of the marijuana, Will advised Det. Menendez that he had sold twenty-two pounds of marijuana to a white male named "Butch".

Will said he drove to Butch's house on Ridgedale Drive in High Ridge, Missouri and Butch gave him $13,000 for the twenty-two pounds of marijuana. Will further stated that he was later contacted by Butch who advised him that he did not like the quality of marijuana and wanted to return the marijuana and exchange it for different marijuana or get his money back.

Will told Butch he had over one hundred pounds of marijuana being delivered to him and it was supposed to be of better quality. Butch advised Will that he would like to exchange the twenty-two pounds of marijuana and in addition, purchase seventy eight more pounds of marijuana. They agreed that Butch would pay $600 per pound.

Butch was identified as Eugene Gill and Will positively identified him as being Butch after viewing Eugene Gill's Missouri Driver's License photo. A computer check of the Department of Revenue records indicated that Eugene Gill gave his residential address as 2000 Ridgedale Drive in High Ridge, Missouri. A criminal inquiry revealed that he had been arrested in the past for drug possession, burglaries and robberies.

Some of the telephone calls to Eugene Gill were conducted on the land line at his residence. A check of the telephone records indicated that the number used was issued to defendant at 2000 Ridgedale Drive. The conversations were also recorded.

On 5/12/04 Will and Eugene Gill were scheduled to meet to discuss the transaction of the 100 pound marijuana deal, with a second meeting where the actual transaction would take place. Those meetings were scheduled to be recorded.

Based on the information contained in the Affidavit, Judge Wegge found probable cause and signed the Search Warrant for 2000 Ridgedale Drive on 5/12/04 at 3:40 P.M.

However, during the application process Det. Menendez received a phone call from Det. Sgt. Boone who said he was with Will making the arrangements to sell defendant the seventy-eight pounds of marijuana. Will said that when he was at defendant's house, he saw the previously sold

twenty-two pounds of marijuana inside a shed on defendant's property.[1] As noted in the Affidavit, defendant was not satisfied with the quality of the twenty-two pounds of marijuana he had purchased and wanted to exchange it. Defendant wanted to see a sample of the good marijuana. Det. Sgt. Boone prepared a "prop", that is, a bag of marijuana obtained from the Police Department laboratory which had been seized in another case. Det. Sgt. Boone gave the prop to Will who gave it to defendant. Defendant said he liked it. The plan was to let defendant think Will had the 100 pounds of good marijuana and defendant would pay the $60,000.

Will had been making recorded calls to defendant and everything was "going fine." However, after Det. Menendez obtained the Warrant, defendant stopped answering his phone. Will went to defendant's house and defendant, apparently suspicious, made Will raise his shirt to make sure he was not wearing a wire. Will **was** wearing a wire but apparently defendant did not see it, however, he threw Will off his property. Will left without the prop bag of marijuana. The officers were able to monitor and hear bits and pieces of this conversation and heard the part about Will raising his shirt.

The officers believed defendant knew what they were planning. For their safety, they decided to wait for defendant to leave his property before executing the search warrant. They observed him driving his pickup truck on the only road going away from his residence to the main road.

They tried to curb defendant's vehicle by means of their flashing lights, however, defendant put his truck in reverse, backed into a driveway and drove back to his house. The officers blocked his path. Defendant stopped and they approached his truck.[2] They saw defendant lean towards the

---

[1] Det. Menendez orally informed both the prosecuting attorney and the judge of the call from Det. Sgt. Boone and told them that Will had just seen the twenty-two pounds of marijuana in the shed.

[2] The officers were wearing police gear, clearly identifying themselves. They wore black shirts with POLICE in large white letters on the back and front. Their badges were hanging around their necks.

floorboard of the truck. They thought defendant was hiding a gun. Det. Jason Scheel opened the door of the truck, dragged defendant out and handcuffed him. Det. Menendez went to the truck and saw an open container on the floor. It contained the kind of pipe used for smoking crack cocaine. Defendant was placed under arrest and Det. Menendez read defendant his Miranda Rights from the Department card:

> The St. Louis Metropolitan Police Department Card states the following:
>
> Warnings – Constitutional Rights
>
> 1. You have the right to remain silent.
> 2. Anything you say can and Will be used against you in court.
> 3. You have the right to a lawyer and to have him with you while you are being questioned.
> 4. If you cannot afford to hire a lawyer, one Will be appointed for you before any questioning if you so desire.

Defendant acknowledged that he understood his rights. He did not appear under the influence of drugs or alcohol at that time. Defendant said the crack in his car was the only thing he had. He said he was on his way to help his brother who had car trouble.

Defendant was told of the Search Warrant. He said he knew they were coming and there was no contraband or money in the house. He said he only had two hunting guns in the house and gave Det. Menendez the keys. Later, during the search of the residence, defendant was asked to sign a Warning and Waiver Form and make a written statement but he refused.

The officers searched the residence. There were no other occupants. Defendant directed them to the bedroom where the two hunting firearms were seized. Det. Menendez was aware at the time that defendant had previously been convicted of a felony.

Det. Menendez asked defendant about his knowledge that they were coming and defendant would not say how he knew. He said he told his wife and children to leave and he cleaned up his house. When asked about the crack, defendant said he smoked it because he was nervous and was surprised when the officers stopped him.

The officers went to the shed where they observed the windows to be open. Based on their experience, they knew the strong odor in the shed was marijuana. When asked about it, defendant said after he cleaned his house, he went for a ride on his ATV and left the windows of the shed open. When he returned he discovered he had been burglarized. The officers searched the area around the shed and found the prop bag of marijuana previously used by Will. The marijuana was still in the bag.

Defendant was conveyed to the Jefferson County Sheriff's Office and the guns and drugs were taken to the lab. The white residue on the pipe was crack cocaine. One of the guns was a percussion rifle which does not qualify as a firearm for federal purposes.

Deputy Marshal Kyle Shirley testified he was the deputy in charge of the investigation and arrest of defendant in February, 2006. He investigated defendant's background and knew that he had previous arrests for Burglary and being a Felon in Possession of a Firearm. Deputy Shirley described in great detail the procedures the Marshals use when they go to arrest someone in a home. These procedures were followed in the instant case.

On February 7, 2006, approximately five Deputy Marshals, nine members of the St. Louis Metropolitan Police Department and three Deputy Sheriffs went to defendant's residence at approximately 7:00 A.M. Deputy Shirley and two other Marshals knocked on the door while other officers surrounded the residence. The door was answered by defendant's wife whom Deputy Shirley recognized from a photo used in the investigation. He asked her her name and she responded Michelle Gill. He told her they had an Arrest Warrant and asked if they could come in. She said defendant was sleeping in the living room/family room and allowed them to enter the house. One Deputy stayed with her while Deputy Shirley and another Deputy went to the family room. They observed defendant asleep on a couch. As Deputy Shirley approached defendant he woke up. He put his hands in the air and Deputy Shirley handcuffed him. Deputy Shirley asked defendant if he had any weapons on his person and defendant responded no. He asked if there were

any weapons in the house, and he responded yes, a handgun and a couple of rifles. He did not ask for an attorney.

During a protective sweep of the residence, Deputy Marshal Keith McGillivrey and Det. Helbling located in the master bedroom in the open closet three long guns leaning against the wall and on the shelf a silver pistol. All of the long guns were immediately visible. The silver pistol was partially obscured by clothing but still visible. Dep. McGillivrey moved the clothing and located another handgun with a loaded magazine. He seized the weapons.

Deputy Shirley read defendant his <u>Miranda</u> Rights from his Rights card. The <u>Miranda</u> card used by the United States Marshals Service reads as follows:

> Before we ask you any questions, it is my duty to advise you of your rights.
> You have the right to remain silent.
> Anything you say can and will be used against you in a criminal proceeding.
> You have the right to talk to a lawyer for advice before we ask you any
> questions, and to have him with you during questioning.
> If you cannot afford a lawyer, one will be appointed for you, if you wish,
> before any questioning begins.
> If you decide to answer questions now without a lawyer present, you still
> have the right to stop answering at any time. You also have the right to
> stop answering at any time until you talk to a lawyer.
> Do you understand your rights?
> Are you willing to waive your rights and talk with us?

Defendant said he understood his rights. He did not appear under the influence of drugs or alcohol at that time.

The officers allowed defendant to get dressed and kiss his wife and kids goodbye. He was placed in Deputy Shirley's vehicle. They had casual conversation about defendant's recently remodeling his house after a fire. Deputy Shirley asked about the guns and defendant said they belonged to his dad. He had planned to take them to his dad's house. Deputy Shirley told defendant he should not have had the guns in his house and defendant said "I know."

**CONCLUSIONS OF LAW**

1.  **Search Warrant**

Search warrants to be valid must be based on a finding by a neutral detached judicial officer that there is probable cause to believe that evidence, instrumentalities or fruits of a crime, contraband or a person for whose arrest there is probable cause may be found in the place to be searched. Johnson v. United States, 333 U.S. 10 (1948); Warden v. Hayden, 387 U.S. 294 (1967); Fed.R.Crim.P. 41. The standard of probable cause for the issuing judge is whether, given the totality of the circumstances, "there is a fair probability that contraband or evidence of a crime Will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983). Probable cause is "a fluid concept--turning on the assessment of probabilities in particular factual contexts--not readily, or even usefully, reduced to a neat set of legal rules." Gates, 462 U.S. at 232. Applications and affidavits should be read with common sense and not in a grudging, hypertechnical fashion. United States v. Ventresca, 380 U.S. 102, 109 (1965). Information contained in applications and affidavits for search warrants must be examined in the totality of the circumstances presented. Gates, 462 U.S. at 230. The duty of the reviewing judge "is simply to ensure that the [issuing judge] had a `substantial basis for . . . conclud[ing]' that probable cause existed." Gates, 462 U.S. at 238-39, quoting Jones v. United States, 362 U.S. 257, 271 (1960). Once a judicial officer has issued a warrant upon a finding of probable cause, that finding deserves great deference. Gates, 462 U.S. at 236. The affidavit presented in the instant case clearly contains the "fair probability" that evidence, instrumentalities or fruits of a crime or contraband would be found at 2000 Ridgedale Drive. The facts set out above show that there was a substantial basis for concluding that probable cause existed.

It is to be noted that Det. Menendez testified that during the application process he told the Judge that he had just received a call notifying him that Will saw the previously sold 22 pounds of marijuana inside a shed on defendant's property. However, there is no evidence that the Judge considered anything other than the four corners of the Affidavit to determine whether probable cause existed. United States v. Solomon, 432 F.3d 824, 827 (8th Cir. 2005) (when issuing judge relies solely on supporting affidavit to issue warrant "only that information which is found within

the four corners of the affidavit may be considered in determining the existence of probable cause"), quoting United States v. Etheridge, 165 F.3d 655, 656 (8th Cir. 1999), quoting United States v. Gladney, 48 F.3d 309, 312 (8th Cir. 1995); United States v. Wells, 347 F.3d 280, 286 (8th Cir. 2004) (when issuing court relies solely on an affidavit to determine whether probable cause exists, only the information found within the four corners of the affidavit may be considered by reviewing court).

In the present case, the Affidavit contained information from an individual identified as Will, who was known to be distributing marijuana and who agreed to cooperate. Willl said that he had sold 22 pounds of marijuana to defendant at defendant's home, that defendant wanted to exchange it for better quality marijuana and purchase 78 pounds more and that they agreed on a price. Some of the calls to and from defendant's home land line were recorded. Meetings (to be recorded) were scheduled to discuss the deal and transact the sale. Reading the four corners of the Affidavit with a common sense approach and not a hypertechnical fashion, United States v. Williams, 10 F.3d 590, 593 (8th Cir. 1993), shows that the Affidavit clearly provided probable cause to support the search for contraband at defendant's residence.

**2. Recorded Calls**

Some of the calls and conversations between defendant and Will were recorded. It is well-established that a law enforcement agent or an informant may *record* conversations between himself/herself and another party without violating the Fourth Amendment or any other law. See United States v. Sileven, 985 F.2d 962 (8th Cir. 1993); United States v. White, 401 U.S. 745, 752 (1971). 18 U.S.C. § 2511(2)(c) Thus the recorded statements were lawfully obtained and are admissible in evidence if otherwise qualified.

It is also clearly established that Fourth Amendment rights are not violated when conversations with a government informant are electronically *monitored* by a government agent with the consent of the informant. Lewellen v. Raff, 843 F.2d 1103, 1116 (8th Cir. 1988), cert.

denied, 489 U.S. 1033 (1989); United States v. McMillan, 508 F.2d 101, 104 (8th Cir. 1974), cert. denied, 421 U.S. 916 (1975).

3.  **Detention of Defendant for the Search**

The existence of a search warrant for a residence provides an objective justification for temporary detention of an occupant of the residence. Michigan v. Summers, 452 U.S. 692, 703 (1981). A neutral judicial officer has determined that police have probable cause to believe that the law was being violated in the house and has authorized "a substantial invasion of the privacy of the persons who reside there." Id. at 701. The detention of one of the residents while the premises are searched is less intrusive than the search itself and is permitted. Id.; United States v. Fullwood, 86 F.3d 27, 29 (2nd Cir. 1996) (permissible to require subject to reenter his home and to handcuff him while search conducted pursuant to valid search warrant). There are three legitimate law enforcement interests that provide justification for detaining an occupant: "preventing flight in the event incriminating evidence is found;" "minimizing the risk of harm to officers;" and facilitating "the orderly completion of the search" because detainees "self-interest may induce them to open locked doors or locked containers to avoid the use of force." Muehler v. Mena, 125 S.Ct. 1465, 1469 (2005) quoting Summers, 452 U.S. at 702-03. Thus, the detention of defendant as he drove from his house and attempted to go back to his house was permissible. This conclusion is bolstered by the fact that defendant gave Det. Menendez the keys to the residence thus avoiding the use of force for the entry. Id.

4.  **Pipe in Plain View**

When defendant backed his car into a driveway and attempted to return to his house, the officers saw him lean towards the floorboards. Believing he was hiding a gun, they removed him from his vehicle. Upon approaching the car, Det. Menendez saw the open container with a crack pipe in it. When police officers are lawfully in a particular location and observe items in plain view which they have probable cause to believe are contraband or evidence of a crime, they may seize such items without a warrant. Coolidge v. New Hampshire, 403 U.S. 443, 464-73 (1971); Arizona

v. Hicks, 480 U.S. 321, 326 (1987); United States v. Garner, 907 F.2d 60, 62 (8th Cir. 1990), cert. denied, 498 U.S. 1068 (1991). There is no requirement that the discovery be inadvertent. Horton v. California, 496 U.S. 128, 136-143, 110 S.Ct. 2301, 2308-11 (1990). Because the officers were lawfully detaining defendant and saw him try to hide what they believed to be a weapon, the observance and seizure of the pipe in plain view was lawful.

5. **Arrest**

When Det. Menendez saw the crack pipe, he placed defendant under arrest. Law enforcement officers may arrest a person without a warrant if they have probable cause to believe that the person has committed or was committing a crime. Gerstein v. Pugh, 420 U.S. 103 (1975); United States v. Watson, 423 U.S. 411 (1976). Probable cause for arrest exists if at the time of the arrest the facts and circumstances within the knowledge of the officers and of which they had reasonable trustworthy information were sufficient to warrant a prudent man in believing that the person had committed or was committing an offense. Beck v. Ohio, 379 U.S. 89, 91 (1964). See also R.S.Mo § 544.216 (a municipal law enforcement officer may arrest on view without a warrant any person about whom he has reasonable grounds to believe has violated any law of this state). The arrest of defendant was lawful.

6. **Statements After Miranda Rights**

Immediately after arresting defendant, Det. Menendez advised him of his Miranda Rights by reading from the Miranda card as fully set out above. Defendant said he understood his rights.

A defendant may knowingly and intelligently waive his rights and agree to answer questions. Miranda v. Arizona, 384 U.S. 436, 479 (1966). When the prosecution seeks to introduce in evidence a statement made by a defendant while in custody, it has the burden of showing by a preponderance of the evidence that the statement was made after a voluntary, knowing and intelligent waiver of the Miranda rights by the defendant. Colorado v. Connelly, 479 U.S. 157 (1986). "The requirement that Miranda warnings be given does not, of course, dispense with the voluntariness inquiry" Dickerson v. United States, 530 U.S. 428, 444 (2000). The court must look to the totality of the circumstances

surrounding the interrogation to determine whether the waiver was the product of a free and deliberate choice, rather than intimidation, coercion, or deception; and whether the waiver was made with an awareness of the right being abandoned and the consequences of the decision to abandon it. Moran v. Burbine, 475 U.S. 412 (1986).

The statement must be voluntary and not the product of any police conduct by which the defendant's Will is overborne. Haynes v. Washington, 373 U.S. 503 (1963); Colorado v. Connelly, 479 U.S. at 170. However, as the Supreme Court stated in Berkemer v. McCarthy, 468 U.S. 420 (1984), "[c]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that law enforcement authorities adhered to the dictates of Miranda are rare." Id. at 433 n. 20; Dickerson, 530 U.S. at 444. This is clearly not one of the rare cases referred to in Berkemer. Defendant's statements should not be suppressed.

**7.     Execution of the Warrant**

Defendant gave Det. Menendez the keys to his residence. There was no impropriety in the execution of the Warrant.

**8.     Search of the Shed**

It is arguable that the search of the shed was beyond the scope of the Warrant. Nothing was seized so it is a non-issue.

**9.     Seizure of the Prop Bag of Marijuana**

The bag was in plain view on the ground. The law concerning plain view is set out above. The seizure of the prop bag was lawful.

**10.    Arrest Warrant Executed 2/7/06**

On 2/7/06 Deputy Marshal Kyle Shirley properly arrested defendant pursuant to an arrest warrant.

**11.    Initial Statements on 2/7/06**

When Dep. Shirley first approached defendant he asked him if he had guns on his person to which defendant responded "no" and if had guns in the house to which defendant responded that

there were a handgun and a couple of rifles. These questions and answers fall squarely within the "safety exception" to the Miranda rule. In New York v. Quarels, 467 U.S. 649 (1984) the court carved out an exception to the exclusionary rule. Even if the elements of custodial interrogation are present, the Court held that Miranda warnings are not required when swiftly developing circumstances threaten public safety. In Quarels, a man arrested in a supermarket was wearing an empty shoulder holster. The police asked him where his gun was without giving Miranda warnings. Quarels, 467 U.S. at 655-56. The Court held that the police may ask questions reasonably prompted by considerations of public safety without violating Miranda. Id. See also United States v. Luker, 395 F.3d 830, 834 (8th Cir. 2005) (holding defendant's response to officers' questions regarding whether there was anything in the vehicle that officers should know about was within the public safety exception to Miranda); United States v. Williams, 181 F.3d 945, 953 (8th Cir. 1999) (holding defendant's statement that there was a gun in the closet in response to officers' questions whether there was anything police should be aware of was within public safety exception); United States v. Knox, 950 F.2d 516, 519 (8th Cir. 1991) (response to police question about gun given before Miranda warnings is admissible under public safety exception because of necessity to locate gun to eliminate danger to police and others). The present situation is analogous. Defendant's initial statements should not be suppressed.

**12.     Protective Sweep and Seizure of Firearms on 2/7/06**

Dep. Shirley had investigated defendant's criminal history and knew he had a previous arrest for being a Felon in Possession of a Weapon. He knew that guns were seized at the time of the execution of the Search Warrant on 5/12/04. He knew that defendant had been storing drugs at his residence and that he had been tipped off about the execution of the Search Warrant. Therefore, following the 2/7/06 arrest, the officers conducted a protective sweep. See Maryland v. Buie, 494 U.S. 325, 337 (1990) ("Fourth Amendment permits a properly limited protective sweep in conjunction with an in-home arrest when the searching officer possesses a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to

those on the arrest scene"). When physical evidence is discovered in plain view during the course of a valid protective sweep, it is admissible at trial. See United States v. Evans, 966 F.2d 398, 400 (8th Cir.) (plain view doctrine permits seizure of items if police are lawfully in position to observe item and if its incriminating character is immediately apparent), cert. denied, 506 U.S. 988 (1992). Here, the arresting officers did not know who else might be in the residence but knew that defendant was known to deal with drug dealers and others who could reasonably possess weapons or pose a danger to the officers. The guns seized during the protective sweep should not be suppressed.

**13. Defendant's Statements on 2/7/06**

Immediately after defendant's arrest, Dep. Shirley advised him of his Miranda Rights from the card used by the Marshal's Service as more fully set out above. Defendant said he understood his rights. He was not coerced or threatened in any way. He got dressed and kissed his wife and children goodbye. He engaged in casual conversation about his house and indicated he knew he should not have had his dad's guns in his house. The law concerning Mirandized statements is set out above. It applies here.

Accordingly,

**IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress Evidence and Statements be **DENIED.** [Doc. 14]

The parties are advised that they have eleven (11) days in which to file written objections to this report and recommendation pursuant to 28 U.S.C. §636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).

/s/Mary Ann L. Medler
**MARY ANN L. MEDLER**
**UNITED STATES MAGISTRATE JUDGE**

Dated this  13th   day of  March, 2006.